***********
The Full Commission has reviewed the prior Opinion and Award based upon the record of the proceedings before Deputy Commissioner Rideout and the briefs and arguments before the Full Commission. The appealing party has shown good grounds to reconsider the evidence, and upon reconsideration, the Full Commission REVERSES the Opinion and Award of the Deputy Commissioner.
 ***********
The Full Commission finds as fact and concludes as matters of law the following, which were entered into by the parties at the hearing before the Deputy Commissioner as:
 STIPULATIONS
1. The date of the admittedly compensable injury in this claim is July 7, 2006. *Page 2 
2. All parties are properly before the Industrial Commission and the Industrial Commission has jurisdiction over this matter.
3. All parties are subject to and bound by the North Carolina Workers' Compensation Act.
4. All parties have been correctly designated and there is no question as to misjoinder or nonjoinder of parties.
5. An employer-employee relationship existed between plaintiff and defendant-employer on July 7, 2006, the date of the injury by accident.
6. At all relevant times, the carrier of workers' compensation insurance in North Carolina with liability for defendant-employer's risk of work-related injuries and occupational diseases was Zurich American.
7. On July 7, 2006, plaintiff's average weekly wage was $571.17, which yields a compensation rate of $380.78.
8. Defendants paid compensation to plaintiff for total disability under the Virginia Workers' Compensation Act at a weekly rate of $372.61 during the 24 weeks and six days between July 6, 2006 and December 27, 2006. These payments will be applied as an offset against compensation payable, if any, through an award of compensation under the North Carolina Workers' Compensation Act, pursuant to N.C. Gen. Stat. § 97-36.
9. During settlement negotiations regarding this injury before the Virginia Workers' Compensation Commission, defendants advanced $10,000.00 to plaintiff, which shall be applied as an offset against any compensation that may be awarded in this claim in North Carolina.
10. The following exhibits were stipulated into evidence:
 a. All Industrial Commission forms filed; *Page 3 
 b. Medical records and medical case management reports from the following providers:
 i. Dillon Internal Medicine Associates;
 ii. Pee Dee Orthopaedic;
 iii. McLeod Regional Medical Center;
 iv. Florence MRI Imaging;
 v. Seltzer Eye Clinic;
 vi. Memorial Hospital of Martinsville;
 vii. Physicians Healthcare of Dillon/Dr. John K. Stanton, D.C.;
 viii. Vision Care, P.A.;
 ix. GENEX;
 x. Dillon Family Medicine;
 xi. McLeod Medical Center-Dillon;
 xii. Stanton Chiropractic Clinic;
 xiii. Memorial Hospital of Martinsville.
 c. Documents from the Virginia Workers' Compensation Commission.
 d. Plaintiff's records generated from plaintiff's employment with defendant-employer.
10. The issues before the Commission are whether plaintiff is disabled as the result of the July 7, 2006 accident and to what benefits plaintiff is entitled.
 ***********
Based upon the competent evidence of record herein, the Full Commission makes the following: *Page 4 
 FINDINGS OF FACT
1. At the time of the hearing before the Deputy Commissioner, plaintiff was a thirty-eight year old male with an eleventh grade education.
2. After two years of working on his father's farm after quitting school, plaintiff started painting water towers. The job required him, while carrying heavy buckets of paint, to climb ladders to get onto platforms, which were raised up the towers like a window-washer's platform. On average plaintiff worked on water towers with elevations of 140 feet. Plaintiff worked with several employers, but worked with defendant-employer for more than five years prior to July 7, 2006.
3. Plaintiff had pre-existing medical problems including a toe removal in 1982 from a gunshot wound, left knee surgery in 1986 from a football injury, a work-related left ankle injury in 1998 that required 12-13 surgeries, and rheumatoid arthritis since 1992. The left ankle injury and surgeries kept plaintiff out of work for about three years and led to an addiction to pain medication that plaintiff eventually overcame. Plaintiff rarely received treatment for the arthritis and his control of this condition was generally poor. He did try to manage his symptoms of rheumatoid arthritis through medications.
4. Plaintiff's right knee allegedly started hurting in 2004 due to the rheumatoid arthritis. Plaintiff had occasional episodes of swelling in his knee during this time. However, plaintiff's doctors were suspicious that his complaints were an effort to get pain medications. Nevertheless, plaintiff's doctors prescribed Celebrex (a non-narcotic) and Lortab so that plaintiff could continue working.
5. Plaintiff saw a rheumatologist several times over a six-month period beginning in July 2004. The rheumatologist noted that plaintiff's right knee did not have effusion and did not *Page 5 
appear to have significant internal derangements, but he ordered an x-ray and MRI. X-rays taken in August 2004 and November 2004 indicated minimal degenerative changes. An MRI on August 11, 2004, showed no abnormal findings in plaintiff's right knee except for "some effusion and bone marrow edema in the proximal tibia consistent with recent trauma."
6. Plaintiff went to the emergency room on December 11, 2005 complaining of right knee pain. However, x-rays taken of the knee were "unremarkable" and "without abnormalities," according to the radiologist.
7. Plaintiff's work with defendant-employer included sandblasting and painting water towers. While plaintiff sometimes experienced right knee pain in the afternoon after working all morning, his condition did not prevent him from working before July 7, 2006. After taking a Celebrex, plaintiff's pain disappeared in about two hours.
8. On July 4, 2006, plaintiff ran out of his Celebrex and sought a prescription refill at the emergency room at Martinsville Memorial Hospital in Martinsville, Virginia, where he was working for defendant-employer. X-rays taken at the emergency room showed mild to moderate degenerative changes in plaintiff's right knee.
9. On July 7, 2006, plaintiff was working for defendant in Colinsville, Virginia. Plaintiff fell 22 feet when he came in contact with a live electrical wire while taking equipment off the water tower. Plaintiff was briefly knocked unconscious and injured his right leg and knee, right arm, neck and back in the fall. He fell into a pile of sandblasting sand and unintentionally scratched his left eye with this sand while rubbing his eye after the fall. Plaintiff also lost several teeth because of the fall.
10. Defendants admitted their liability for these compensable injuries and under the Virginia Workers' Compensation Act began to pay workers' compensation benefits to plaintiff at *Page 6 
a weekly rate of $372.61 and medical compensation. Defendants also stipulated to the compensability of this injury under the North Carolina Workers' Compensation Act. Documents filed with the Virginia Workers' Compensation Commission show that defendants acknowledged that plaintiff "injured his right leg, teeth, left eye, neck and back when he fell off a ladder on July 7, 2006." Although the injury occurred in Virginia, defendant-employer is located in Roanoke Rapids, North Carolina, and therefore North Carolina has jurisdiction over the claim.
11. Plaintiff was taken to the emergency room at Martinsville Memorial Hospital after his accident on July 7, 2006. An x-ray of the cervical spine revealed no fracture or subluxion. An x-ray of the right upper extremity revealed a "slightly displaced non-angulated fracture of the radial diaphysis at junction of proximal and middle third." An x-ray of the right knee revealed a nondisplaced fracture of the proximal fibula and degenerative arthritis. The emergency room physician, Dr. John McGee, diagnosed a right radial shaft fracture and a right proximal fibular fracture. Plaintiff was prescribed a knee immobilizer and instructed to follow up with his family physician upon returning to his home in South Carolina.
12. On July 19, 2006, plaintiff went to his family doctor and was treated by Dr. Cliff Medina, an associate of plaintiff's regular doctor, Dr. James Kelly. Plaintiff was wearing the knee immobilizer at that time. The doctor's notes indicate injuries to plaintiff's right arm, right leg, and left eye. The family practice referred plaintiff to a chiropractor for his neck and back pain.
13. Plaintiff was referred to an orthopedic surgeon, Dr. Danny Nichols of Pee Dee Orthopaedic Associates. On July 24, 2006, Dr. Nichols performed an open reduction and internal fixation (ORIF) of the right radial shaft fracture in plaintiff's right arm at McLeod Regional Medical Center. However, a small bony fragment was left loose and plaintiff now has *Page 7 
a plate and hardware in his arm. Plaintiff recovered well after this surgery, but testified that in the four months prior to the Deputy Commissioner's hearing, the arm pain had gotten worse.
14. Plaintiff has had vision problems resulting from the July 7, 2006 accident. Before the accident plaintiff's vision was 20/20. After the accident, his vision declined as much as 20/80. Upon his family doctor's referral, plaintiff saw Dr. Mark Vinson, an optometrist, on July 28, 2006, who noted macular edema and a corneal scar due to trauma. This treatment was paid by defendants. Dr. Vinson referred plaintiff to an ophthalmologist for further care.
15. Plaintiff was treated by Dr. John K. Stanton, a chiropractor, and Dr. Patricia Sullivan, an internist, between August 7, 2006 and November 6, 2006. Defendants did not pay for this treatment, although they gave verbal authorization to these providers. Plaintiff's back and neck condition improved after receiving this treatment.
16. Plaintiff's right knee became considerably more swollen immediately following his fall on July 7, 2006. The swelling has gotten progressively worse since the accident and plaintiff now uses a cane or crutch to walk distances of more than several feet. He has limited range of motion, stiffness, and crepitus in his right knee. He cannot bear his own weight on his right leg and cannot walk or stand for more than a few minutes. Plaintiff's mobility has gotten considerably worse because of the accident, since plaintiff did not need to use a cane and had no problems walking or standing until the fall.
17. An MRI scan of the right knee on September 6, 2006, revealed a proximal fibular head fracture, a strain of the posterior cruciate ligament, and "large complex joint effusion with extensive heterogeneity, likely due to synovial hypertrophy and intra-articular debris."
18. On September 14, 2006, plaintiff was released to return to regular work without restrictions "as tolerated," by the orthopedist, Dr. Danny Nichols, based on the fact that plaintiff left Dr. Nichol's *Page 8 
office without completing treatment. However, plaintiff's ill, elderly father accompanied him that day. After waiting three hours to see Dr. Nichols, the physician wanted plaintiff to get x-rays and sign up for therapy. Because of his concern for his father's health after waiting so long, plaintiff told the doctor that he could not wait anymore and left the office. The Commission gives little weight to Dr. Nichol's work release.
19. Dr. Samuel Seltzer, an ophthalmologist, treated plaintiff's eye injury on September 15, 2006. Dr. Seltzer saw no macular edema at that time, but the corneal scar remained. Plaintiff's blurry vision, which was noted in the medical records immediately after the fall, was the result of this corneal scar. Dr. Seltzer recommended gas permeable contacts for plaintiff and if these did not improve his visual loss, a corneal transplant might be necessary in the future. Dr. Seltzer did not have an opinion on the causal relationship between plaintiff's left eye condition and the compensable fall.
20. On January 17, 2007, x-rays of plaintiff's right knee revealed advanced valgus deformity with essentially bone-on-bone arthropathy. These findings represent a worsening of plaintiff's pre-existing degenerative arthritic condition in his knee, compared to similar diagnostic studies taken before his injury in July 2006. Plaintiff's orthopedist advised that plaintiff needed a total knee replacement and injections in his knee for this condition, and that plaintiff would need a total knee replacement every eight years on average thereafter.
21. On February 5, 2007, Dr. Kelly released plaintiff to return to regular work duty. However, Dr. Kelly explained that he really believed that plaintiff was not capable of working, and that he wrote the note because plaintiff told him that he had to get back to work. At his deposition Dr. Kelly explained that he wrote the work release only at plaintiff's urging, because Dr. Kelly "was trying to get him help. I wasn't worrying about work related or not work related *Page 9 
stuff, to be honest with you. . . . I was trying to get him some sort of help; this guy just can't work." Therefore, the Commission gives little weight to the release to full duty work. When asked at his deposition whether plaintiff's disability since July 7, 2006, was caused by the fall, Dr. Kelly responded:
 A. I think there is a cause and effect that the fall sets this off. But, at the same time, I think if he was treating his rheumatoid well, he may have been able to go back to work; I just don't know. . . . I really think that he would have, if he was taking stuff for rheumatoid, he would have been able to go back to work.
 Q. . . .But he's not able to do that now?
 A. No.
22. On September 3, 2007, plaintiff went to the emergency room at McLeod-Dillon Hospital because of right knee pain. X-rays confirmed a dramatic progression of the degenerative abnormalities in plaintiff's right knee, including a marked loss of joint space laterally and to a lesser degree medially, juxtaarticular sclerosis, and erosions. However, these arthritic changes were far advanced and marked for someone of plaintiff's age. The findings represent a worsening of plaintiff's underlying degenerative arthritic knee condition compared to other diagnostic studies taken before his accident on July 7, 2006.
23. The greater weight of the credible evidence shows that plaintiff's accident on July 7, 2006 caused an aggravation and acceleration of the underlying degenerative changes from the rheumatoid arthritis in plaintiff's knee.
24. The greater weight of the credible evidence shows that the macular edema and corneal scar on plaintiff's left eye are causally related to the compensable fall on July 7, 2006.
25. The greater weight of the medical evidence shows that plaintiff has been medically unable to work because of his injury by accident since July 7, 2006. Dr. Kelly stated, *Page 10 
and the Commission finds, that plaintiff has been disabled since July 7, 2006 from any type of job that would require any physical activity. Although plaintiff has made some effort to find work, it would be futile for plaintiff to look for suitable employment without the help of a vocational rehabilitation professional and without further education, given his physical restrictions.
26. Defendants underpaid plaintiff by $8.17 per week between July 7, 2006 and December 27, 2006, representing the difference between the $380.78 compensation rate in North Carolina and the $372.61 paid under Virginia law.
27. Plaintiff has received reasonable and necessary medical treatment related to his injuries from Dr. Stanton, Dr. Kelly, Dr. Vinson, Dr. Seltzer, Martinsville Memorial Hospital (on and after July 7, 2006), Dr. Nichols, Dr. Clark, and Dr. Sullivan. However, Dr. Kelly has been the only doctor who has continued to treat plaintiff on a regular basis. Dr. Kelly shall continue to be plaintiff's authorized treating physician and Dr. Kelly shall refer plaintiff to other specialists if necessary.
28. None of plaintiff's treating physicians have addressed whether plaintiff retains a permanent partial impairment of his right upper extremity and/or right lower extremity. Defendants shall provide plaintiff with an evaluation to determine whether there is any such impairment and, if applicable, plaintiff shall be entitled to an award of permanent partial disability.
29. Defendants shall be entitled to a credit of $10,000.00 against any award of benefits. This is the sum advanced to plaintiff as a part of the agreement to settle his claim in Virginia. The settlement was not approved by the Virginia Workers' Compensation *Page 11 
Commission, as plaintiff indicated his desire to withdraw from the agreement prior to its approval.
30. Defendants paid to plaintiff temporary total disability benefits from July 7, 2006 to December 27, 2006, pursuant to the Virginia Workers' Compensation Act. Defendants also provided medical treatment pursuant to that Act.
 ***********
Based upon the foregoing stipulations and findings of fact, the Full Commission makes the following:
 CONCLUSIONS OF LAW
1. The North Carolina Industrial Commission has proper jurisdiction of this claim. N.C. Gen. Stat. § 97-36.
2. On July 7, 2006, plaintiff sustained an admittedly compensable injury to his right knee, right arm, head, neck, left eye, and teeth by accident arising out of and in the course of his employment on July 7, 2006. N.C. Gen. Stat. § 97-2(6). Plaintiff's compensable condition includes an aggravation and acceleration of his underlying rheumatoid arthritis. See, Anderson v. Northwestern Motor Co., 233 N.C. 372,64 S.E.2d 265 (1951).
3. In order to meet the burden of proving disability, a plaintiff must prove that he was incapable of earning pre-injury wages in either the same or in any other employment and that the incapacity to earn pre-injury wages was caused by plaintiff's injury. Hilliard v. ApexCabinet Co., 305 N.C. 593, 290 S.E.2d 682 (1982). An employee may meet the initial burden of production by producing one of the following: (1) medical evidence that he is physically or mentally, as a result of the work-related injury, incapable of work in any employment; (2) evidence that he is capable of some work, but that he has, after a reasonable effort, been *Page 12 
unsuccessful in his efforts to obtain employment; (3) evidence that he is capable of some work, but that it would be futile because of preexisting conditions, such as age, inexperience, or lack of education, to seek employment; or (4) evidence that he has obtained other employment at wages less than his pre-injury wages. Demery v. PerdueFarms, Inc., 143 N.C. App. 259, 545 S.E.2d 485 (2001); Russell v. LowesProduct Distribution, 108 N.C. App. 762, 425 S.E.2d 454 (1993). When a plaintiff meets his burden of showing disability, the burden then shifts to defendants to produce evidence that suitable jobs are available for the employee and that the employee is capable of obtaining a suitable job, taking into account both physical and vocational limitations.Demery v. Perdue Farms., Inc., supra.
4. In the instant case, plaintiff met his initial burden to show that he is disabled by providing the medical evidence from Dr. Kelly that he is unable to work in any employment. Additionally, plaintiff has shown that even if he is capable of some work, it would be futile for him to seek employment because of his limited education and physical restrictions, without the assistance of vocational rehabilitation.
5. As the result of the compensable fall on July 7, 2006, plaintiff has been disabled from any employment from July 7, 2006 through the present and continuing and is entitled to payment by defendants of total disability compensation at the rate of $380.76 per week from July 7, 2006 and continuing until further Order of the Commission. N.C. Gen. Stat. § 97-29.
6. Plaintiff is entitled to payment by defendants of all medical treatment related to his compensable injury by accident. The approved medical treatment includes treatment for the admittedly compensable injuries to plaintiff's neck and back, right arm, right knee, teeth, and left eye. Dr. Kelly shall be plaintiff's authorized treating physician.
 *********** *Page 13 
Based upon the foregoing findings of fact and conclusions of law, the Full Commission enters the following:
 AWARD
1. Subject to the attorney's fee awarded below, defendants shall pay plaintiff total disability compensation at the rate of $380.76 per week from July 7, 2006 and continuing until further Order of the Commission. Defendants are entitled to a credit for the disability compensation already paid to plaintiff for this period, but shall pay an additional $8.17 per week between July 7, 2006 and December 27, 2006, representing the difference between plaintiff's compensation rate paid under Virginia law and the compensation rate to which he is entitled under North Carolina law.
2. Defendants shall pay for all reasonable medical treatment related to plaintiff's compensable injury, including but not limited to the right knee and any necessary surgery and treatment for the corneal scar, if recommended by plaintiff's treating physicians. Dr. Kelly is approved as plaintiff's authorized treating physician.
3. Defendants shall provide plaintiff with an evaluation to determine if he retains any permanent partial impairment of the right upper extremity and the right lower extremity.
4. Plaintiff's counsel is entitled to a reasonable attorney's fee of 25% of all compensation awarded plaintiff in paragraph 1 above, which is to be calculated before deduction of the offset in paragraph 5 below. Defendants shall pay these fees directly to plaintiff's counsel.
5. Defendants are entitled to offset all amounts of compensation awarded to plaintiff by $10,000.00, pursuant to the parties' stipulation.
6. Defendants shall pay the costs due this Commission.
This the 24th day of November, 2008.
 S/_______________________
 LAURA KRANIFELD MAVRETIC
 COMMISSIONER
CONCURRING:
 S/_______________________ BERNADINE S. BALLANCE COMMISSIONER
 S/_______________________ DANNY LEE McDONALD COMMISSIONER *Page 1